BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
saviles@whafh.com

*Attorneys for Plaintiff Clifton Murie*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON MURIE, Derivatively on Behalf of NEXTRACKER, INC., | Case No. _____ |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| DANIEL SHUGAR, HOWARD WENGER, WILLIAM WATKINS, JULIE BLUNDEN, JONATHAN COSLET, JEFF B. GULDNER, STEVEN MANDEL, WILLY SHIH, BRANDI THOMAS, DAVID BENNETT, and CHARLES BOYNTON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| NEXTRACKER, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Clifton Murie ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nextracker, Inc. ("Nextracker" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of law that has occurred from February 1, 2024 through to the present (the "Relevant Period") and which has caused substantial harm to the Company.

## JURISDICTION

2.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) Defendants have otherwise purposefully availed themselves of this District.

5.    In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

**Plaintiff**

6.    ***Plaintiff Clifton Murie*** ("Plaintiff") is, and was at all relevant times, a shareholder of the Company and presently owns shares of the Company's common stock as of the date of the filing of this Complaint.  Plaintiff will hold shares of the Company throughout the duration of this derivative action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

7.    ***Nominal Defendant Nextracker*** is a Delaware corporation with its principal executive offices located in Fremont, California.  The Company's stock trades on the Nasdaq Stock Exchange under the ticker symbol "NXT."

**Director Defendants**

8.    ***Defendant Daniel Shugar*** ("Shugar") was at all relevant times the Chief Executive Officer ("CEO"), and a co-founder of Nextracker.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9.     *Defendant Howard Wenger* ("Wenger") was at all relevant times President and a director of Nextracker.

10.    *Defendant William Watkins* ("Watkins") serves as the Chairman of the Board.

11.    *Defendant Julie Blunden* ("Blunden") serves as a director of the Company.

12.    *Defendant Jonathan Coslet* ("Coslet") serves as a director of the Company.

13.    *Defendant Jeff B. Guldner* ("Guldner") serves as a director of the Company.

14.    *Defendant Steven Mandel* ("Mandel") serves as a director of the Company.

15.    *Defendant Willy Shih* ("Shih") serves as a director of the Company.

16.    *Defendant Brandi Thomas* ("Thomas") serves as a director of the Company.

17.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

18.    *Defendant David Bennett* ("Bennett") was Nextracker's Chief Financial Officer ("CFO") during the Relevant Period until May 2024, when he transitioned to be the Company's Chief Accounting Officer.

19.    *Defendant Charles Boynton* ("Boynton") has been CFO of Nextracker since May 2024.

20.    Defendants Bennett and Boynton, along with Defendants Shugar and Wenger are collectively referred to herein as the "Officer Defendants."

21.    The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

22.    Nextracker is a supplier of software solutions and products that enable solar panels to follow the sun's movements across the sky to optimize utility power plant performance.

23.    In February 2023, Nextracker completed its initial public offering ("IPO"), spinning off from Flex Ltd. ("Flex"), an international electronics manufacturing services ("EMS")

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and original design manufacturer ("ODM").  In January 2024, Nextracker announced that Flex had completed the spin-off and sale of its remaining interests in the Company.

24.    Nextracker's customers include engineering, procurement, and construction firms ("EPCs"), as well as solar project developers and owners.  Developers originate projects, select and acquire sites, obtain permits, select contractors, negotiate power offtake agreements, and oversee the building of projects.  EPCs design and optimize the system, procure components, build and commission the plant, and operate the plant for a limited time until transfer to a long-term owner.  Owners, which are often independent power producers, own and operate the plant, typically as part of a portfolio of similar assets.  Owners generate cash flows through the sale of electricity to utilities, wholesale markets, or end users.

25.    The solar tracker market increases energy production and improves the levelized cost of energy ("LCOE"), the average cost of electricity generation over the lifetime of an energy asset. Thus, the majority of utility-scale projects installed today in mature markets use solar traction, and adoption of the technology is growing in developing markets. The United States is the Company's most important and profitable market, generally accounting for more than two-thirds of its business.

26.    In order to incentivize the installation of solar facilities in the United States, the U.S. government passed the Inflation Reduction Act of 2022 ("IRA").  The IRA entitles manufacturers that support clean energy in the United States with a tax credit for each clean energy component domestically produced and sold by a manufacturer.  As a result of the proliferation in solar installations following the passage of the IRA, leading up to the IPO Nextracker reported robust growth.  For the fiscal year ended March 31, 2022, the Company reported $905 million in annual revenue for its U.S. business, representing 62% growth over the prior year period.

27.    Investors closely track Nextracker's backlog, viewing it as a measure of the health of Nextracker's business.  Nextracker defines backlog as executed contracts or purchase orders with deposits and specific bills of material for specific projects with indicated start dates.  The length of time it will take the Company to fulfill backlog orders is highly material to investors, as

this will determine the rate at which Nextracker is expected to recognize revenue from its work on contracted projects in future periods and thus provides an important indication of the Company's revenue trajectory and expected growth rate. As of March 31, 2023, Nextracker stated that its backlog had grown to $2.6 billion, representing a 90% increase year-over-year. By Nextracker's third fiscal quarter ended December 31, 2023, the Company's backlog had grown to record levels, significantly exceeding $3 billion. Nextracker's revenue and adjusted earnings had risen in tandem, growing to $710 million (up 38% year-over-year) and $168 million (up 168% year-over year) during the quarter, respectively.

28.     The solar tracking industry is subject to the risk that projects may become delayed due to a variety of reasons, such as an inability to timely secure necessary permits for project completion, the unavailability of project components or materials, regulatory hurdles, inclement weather, or construction setbacks. In Nextracker's IPO prospectus, the Company stated that delays were possible and "could have a material adverse effect on [its] business, financial condition and the results of operations."

29.     Despite the possibility of project delays and the materially adverse nature of such occurrences to the Company's business and prospects, leading up to and during the Relevant Period, Defendants repeatedly downplayed the impact that project delays were having on the Company's business and financial results, representing that any delays were limited to isolated projects, more than offset by expanding business opportunities and client demand (which supported repeated guidance raises), and in line with historical trends. Company executives expressly disavowed that Nextracker was suffering from the same ill effects arising from project delays affecting the rest of the solar tracking industry, claiming that the Company had avoided comparable problems in the face of such headwinds because of its purported competitive advantages and robust client demand.

30.     In May 2023, during Nextracker's first earnings call as a public company, defendant Shugar reassured analysts inquiring about the possibility for project delays to negatively impact the Company, stating: "You can have issues where a construction permit is delayed. But

in aggregate, there are so many projects and so much demand.  That's why we're seeing our revenue keep going up and our plan keep going up."

31.     Similarly, during a July 2023 earnings call, defendant Shugar claimed that Nextracker was able to offset any individual project delays by simply prioritizing other projects in the Company's pipeline:

> So with respect to a project permitting, first, our increased guidance reflects the environment that we're operating in, our expectations. Any individual project can be pushed there is an enormous portfolio of projects that we're supporting. So we take those factors into account where entitlements are either granted or we consider upcoming projects on a probabilistic basis based on the level of entitlements and where they stand. An advantage for us in managing so many projects in so many geographies is that if one project has slowed down, there's usually another wanting to take its place.

32.     Later, when asked to elaborate on the magnitude of delays in permitting and solar panel availability, defendant Shugar responded: "Typically, it's just business as usual . . . ." Defendant Shugar continued:

> [T]here'll be a few jobs that have an issue. Whether it's a permit issue or a panel issue or something. We're confident in our forecast and which is why we increased our guidance 10% – I'm sorry, 5% of revenue as covered by day and 10% on earnings, we're not seeing delays in orders. We're seeing projects proceeding, but then there'll be occasional projects that have – they – every project requires a local jurisdiction to issue a building permit. Just like if you're adding a bathroom at your house or something you need a permit for that. And so some local jurisdictions, there's delays in what was originally anticipated by the project. But in aggregate, the overall demand, we're seeing strong demand and strong fulfillment with occasional delays, but in aggregate, we're able to grow and increase our guidance.

33.     During an October 2023 earnings call, defendant Shugar conveyed similar confidence that Nextracker was purportedly experiencing "not a new" level of permitting delays, and that any such delays were project specific rather than widespread and more than offset by increasing demand and Nextracker's ability to prioritize other projects in the construction queue. Defendant Shugar stated:

[E]ven within a given customer, they have 1 project that's delayed, often they'll have another project, which can fill its gap.

Now for sure, there's been individual projects that experienced delays that happens. That's not a new thing. We've just seen just a huge amount of demand in the markets in the U.S. and abroad and our record results in terms of revenue recognition, bear that out from what we've accomplished so far and our confidence that, that's going to continue, has enabled us to increase our guidance on revenue for this year.

34.    In November 2023, Nextracker's biggest competitor, Array Technologies, Inc. ("Array") revealed that it was suffering from significant interconnection and panel availability issues that were causing project delays and shifts in the timelines for project completion "for a couple of quarters now."  Array added that delays were also being caused by customers awaiting clarity around the IRA.

35.    Even after acknowledgments by others in its industry that delays were negatively affecting project timelines, Nextracker and its management continued to claim that the Company was not being similarly impacted by project delays, as any setbacks with respect to an individual project were more than set off by the ability of the Company to move to the front of the queue other projects given the robust demand environment that Nextracker was purportedly experiencing for its products and services.  For example, during a January 5, 2024 Goldman Sachs investor conference, defendant Bennett claimed that Nextracker was not experiencing a "delay in booking deals because of a lack of clarity with [the] IRA."  He further stated that while industry "headwinds are real," they were offset by "significantly stronger" tailwinds.  Defendant Bennett stated:

You spoke about headwinds. The headwinds are real. We have interconnection permitting labor to some extent panel availability for the U.S. Sometimes all of those are real. However, we see the tailwinds being significantly stronger than those headwinds. And an example of what NEXTracker does to manage through those is just think about it. As a few years ago, we'd have 50 projects and you'd see a delay of one or two of those projects related to some permitting or interconnects. Today, we see more pushouts for interconnection panels and labor. However, where we had 50 projects in the pipeline, we now have 250. So we have the ability to manage and pivot to a different project and meet our commitments. So it's one of those things that these headwinds are new. It's something we've been working with. And the NEXTracker team has very deep experience in dealing with these things,

7

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

working with our with our EPC partners, owner developers and managing to the timelines of projects that enable us to meet our economic commitments. And that's what we're doing.

36.    During the Relevant Period, Defendants continued to minimize the impact of project delays on Nextracker's business, claiming that the delays were isolated to individual projects and that the Company was simply better at managing project timelines than its competitors and that favorable financial and operating trends purportedly more than offset any adverse effects.

37.    Unbeknownst to the market, as the Individual Defendants knew or recklessly disregarded, these assurances were materially false and misleading when made. In reality, Nextracker was suffering the negative effects of panel availability and interconnection and permitting delays, as well as delays caused by customers awaiting clarity on the IRA, to a far greater extent than previously disclosed, which had negatively and materially impacted the Company's ability to convert its backlog to revenue in line with its historical conversion rates. Furthermore, the purported increase in client demand and Nextracker's ability to shuffle project timeliness was not effectively offsetting the negative impact of these project delays, leading to elongated project timelines and rendering the purported competitive advantages highlighted by Defendants illusory. Defendants' failure to disclose these adverse facts caused the price of Nextracker stock to trade at artificially inflated prices, reaching a high of over $62 per share during the Relevant Period.

## MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

38.    On January 31, 2024, after the market closed, Nextracker issued a release announcing the Company's financial results for its third fiscal quarter ended December 31, 2023 (the "3Q24 Release"). The release reported a 38% year-over-year increase in quarterly revenue to $710 million, a 168% year-over-year increase in quarterly adjusted EBITDA to $168 million, and "[r]ecord" backlog.    The release also revised Nextracker's 2024 annual outlook upward, increasing: (i) revenue to a range of $2.425 billion to $2.475 billion, from a range of $2.3 billion to $2.4 billion; (ii) adjusted EBITDA to a range of $475 million to $500 million, from a range of

$390 million to $440 million; (iii) GAAP net income to a range of $374 million to $429 million, from $237 million to $266 million; and (iv) adjusted diluted EPS to a range of $2.55 to $2.75, from a range of $1.95 to $2.15. In the release, Defendant Shugar stated that "'Nextracker achieved a record third quarter, outperforming across revenue, profit and backlog, which reflects strong execution and spotlights our capability to meet customer requirements.'" Defendant Shugar further stated that Nextracker was "'well positioned as the global leader in trackers and we're just getting started.'"

39.    Also, on January 31, 2024, Nextracker held an earnings call with analysts and investors to discuss Nextracker's third quarter 2024 results hosted by Defendants Shugar, Wenger and Bennett. In his prepared remarks, defendant Shugar highlighted "another strong quarter" that resulted in "record revenue, profits and backlog." Defendant Shugar claimed that Nextracker now had backlog "significantly exceeding $3 billion," and pointed out that this was "the third consecutive quarter we've raised our revenue and profit guidance." Defendant Shugar highlighted "multiple headwinds and tailwinds impacting solar development velocity" in the United States, the Company's most important market. He stated that "in totality" the tailwinds of increased demand continued to offset the headwinds of "specific project" delays and that the conditions causing delays were improving, stating:

> Starting with the United States. As covered on our previous calls, there are multiple headwinds and tailwinds impacting solar development velocity. Headwinds, including interconnection backlogs, permitting delays and equipment shortages are real and can impact any specific project, EPC or developer. But in totality, the combination of new entrants in both developers and EPCs and the increasing number of projects in their portfolios has allowed the market to continue expanding.
>
> Solar panel availability in the United States has improved significantly over recent quarters. And as things stand today, we are not seeing panel availability as a first-order problem in the market. There are, however, multiple trade proceedings pending, which could impact panel imports from certain geographies into the US. We will need to see how this evolves over time to determine any potential impact.

40.    Defendant Wenger added that any project delays during the quarter were "more than offset by other projects pulling in ahead." He added that Nextracker "had another excellent quarter for new business with a book-to-bill ratio greater than one." In regard to the IRA tax credit, defendant Wenger stated that they were "not seeing a significant impact on US project deliveries or on new bookings." He added that "[c]ustomers and projects are transacting. And as we have outlined in previous earnings calls, we continue to see positive demand activities as our backlog continues to grow."

41.    During the question-and-answer portion of the call, defendant Wenger was asked by an analyst whether any sizable projects that were pulled forward were responsible for the increased guidance. Defendant Wenger maintained that "[i]t really is just broader market acceleration." Defendant Wenger added that "there's simply more developers and more EPCs" and "we're doing a good job . . . winning the share of the business . . . the demand strength is there."

42.    Analysts hailed defendants' claims that Nextracker was apparently not suffering from the same project delays that were affecting the rest of the industry. For instance, *Barron's* reported that "Nextracker Is the Rare Solar Stock That Isn't Suffering From Slowing Demand." Similarly, analysts at BofA Securities noted that Nextracker's purported ability to avoid project delays from impacting its portfolio and revenue conversion was in "contrast to [its] peers." On the basis of defendants' representations, price of Nextracker stock jumped by nearly 25% to $56.50 per share on February 1, 2024.

43.    On February 7, 2024, Nextracker filed with the SEC on Form 10-Q the Company's financial results for its third fiscal quarter ended December 31, 2023, which was signed by defendants Shugar and Bennett. The Form 10-Q contained the financial information regarding Nextracker's quarterly financial results contained in the 3Q24 Release.

44.    On March 5, 2024, defendant Shugar spoke about Nextracker at the Bank of America Power, Utilities & Clean Energy Conference. The first question posed to defendant Shugar was how he expected Nextracker to grow in light of the hurdles to growth apparently

affecting its peer companies. In response, Defendant Shugar represented that the "tailwinds in totality are stronger than the headwinds" and that Nextracker was better able to navigate the headwinds than its peers, stating:

> So there are headwinds and there's tailwinds. We've seen companies that are underperforming in this space, really highlighting a lot of the headwinds. Those headwinds include, permitting delays, interconnection queue delays, equipment shortages, labor issues, inflation, costs and capital, are all those things real, definitely they're all real and those things can impact any individual project.
>
> That's true. But the tailwinds in totality are stronger than the headwinds . . . .
>
> * * *
>
> But from a financial standpoint, you're way better off today than you were 18 months ago, clearly.
>
> Okay. Now with respect to the implementation issues we spoke to, hey, it's taking longer to get things permitted, that's true. I've got interconnection queues problems with PJM or these other grids we're trying to connect with. That's a fact.
>
> But the universe of developers, the number of projects at each developer, the size of the projects that the developer owners and the universe of EPCs, engineering, procurement, construction companies that build these is vastly larger. So we have this huge pool of participants in the space, because there's incredible profit opportunity for them and folks are moving to they want to decarbonize.
>
> There's real goals out there with utilities and others to get this done. So in totality, you're seeing the market up and to the right, which is why Nextracker has sustained a 30% annually compounded growth up through our projection, which is up through the end of this of our fiscal year closes at the end of this month.

45.    On March 18, 2024, Defendant Wenger spoke about Nextracker at the Roth Conference. The first question posed by the host was how Nextracker was apparently "able to avoid showing any of that slowdown" affecting its competitors. Again, Defendant Wenger claimed that elevated demand and the ability to pull forward projects was offsetting any "particular project" delays, stating:

> First of all, what we do is we pull back and look at the macro demand for solar power and it's strong still globally in the key markets. And the US being the number one market in the world for large scale outside of China, and that's both in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

volume. And also the economics are superior in the United States and so what we're seeing is actually increased levels of development, meaning more investment from development and owners in large-scale solar.

We're seeing our pipeline is actually growing over time. It's strong there are headwinds and tailwinds we talk about. There are a number of headwinds that can cause a particular project in an owner's portfolio to move to the right and be delayed. It can be a high-voltage transformer or switchgear or not getting an interconnection agreement or not getting final approval to move forward.

So things can move. We've seen some projects pull forward and for us, being the market share leader, we have about 34% global market share and tracking. We have – and the three of our businesses outside of the United States. We have a diversified enough portfolio that we're managing to. And so far, the results speak for themselves. We've been up and into the right and growing.

46.    On May 14, 2024, Nextracker issued a release which announced the Company's financial results for its fourth fiscal quarter and full year ended March 31, 2024 (the "FY24 Release"). The release reported a 42% year-over-year increase in quarterly revenue to $737 million and a 120% year-over-year increase in quarterly adjusted EBITDA to $160 million. For the full year, the release reported a 31% year-over-year increase in revenue to $2.5 billion and a 150% increase year-over-year in adjusted EBITDA to $521 million, with an end-of-the-year backlog of over $4 billion. The release also provided annual fiscal 2025 guidance of: (i) revenue in a range of $2.8 billion to $2.9 billion; (ii) adjusted EBITDA in a range of $600 million to $650 million; (iii) GAAP net income in a range of $369 million to $399 million; and (iv) adjusted diluted EPS in a range of $2.89 to $3.09. In the release, Defendant Shugar stated that "'[f]iscal year 2024 was a year of strong execution and significant growth for Nextracker, and we reached a record backlog of over $4 billion that more than tripled in 2 years.'" Defendant Shugar continued: "'We've accelerated our pace of product innovation, scaled global revenue and supply chain, more than doubled our profits from the prior year, and exceeded all elements of our full year guidance.'"

47.    Also, on May 14, 2024, Nextracker held an earnings call with analysts and investors to discuss Nextracker's fiscal year 2024 results hosted by Defendants Shugar, Wenger and Bennett. In his prepared remarks, Defendant Shugar stated that "strong execution by Team Nextracker

enabled us to achieve record revenue, profits, and backlog." Defendant Shugar added that "[s]trong sales momentum globally resulted in a new record backlog of over $4 billion," a 50% increase over the prior year and triple Nextracker's backlog two years ago. Defendant Shugar dismissed concerns about project delays, stating that the Company's strong growth rate and backlog more than offset any negative impacts "in totality," stating:

> Nextracker's history of 30% CAGR over the last five years reflects favorably on the EIA forecasts, as does our strong backlog. On prior earnings calls, we've had questions regarding sector headwinds in interconnection, permitting, and other areas. We noted that these headwinds can be real for any given project or customer, but that the total universe of projects in customers has grown such that in totality, the market continued strong growth.

48.     In his opening remarks, Defendant Wenger stated that Nextracker's backlog had increased every quarter since its February 2023 IPO and was "supportive of [the Company's] fiscal year '25 guidance." Defendant Bennett added that "[t]here was strong execution by our teams in progressing projects to plan this quarter."

49.     During the question-and-answer portion of the call, Defendants were asked whether they were seeing any elongation of the time to convert Nextracker's backlog into revenue. In response, Defendant Wenger denied this was occurring, stating that "we're pleased with the growth of our backlog" and that "[t]ypically" backlog converts to "revenue in two to eight quarters, and most of that in two to five quarters."

50.     Later during the call, an analyst questioned how much Nextracker had "pull[ed] forward" projects to support 2024 results, which could negatively impact Nextracker's fiscal 2025. In response, Defendant Bennett maintained that "[n]one of it was pulled into '24 from '25." Another analyst asked Defendant Bennett whether Nextracker's guidance for fiscal 2025 was conservative. In response, Defendant Bennett asserted that any timing delays and other headwinds were "not meaningfully different" than the Company had experienced in the past and already factored into Defendants' guidance and comments to investors, stating:

Yes, I think Howard just really kind of touched on this with the – you know, it's about individual projects and their timing to delivery and the content of our backlog that we consider VCAs and EPC contracts the same in that backlog now. So relative to the rollout, Howard touched on it at a two-to-eight-quarter clip. I think in the past that's not meaningfully different, but the specific projects that are in that backlog have a timing to ship now, and that really is what supports our guide. And keep in mind, our guide has historically – we've proven to you guys that we do factor in the headwinds that can happen. I spoke to it every quarter. We kind of factor in a little conservatism relative to weather and other things in logistics may happen that push individual deliveries out that may impact or achieving a number. So we've factored that into our guide. And overall, I think you can see the strong backlog, at a record over $4 billion, certainly supports the guidance range.

51.    On May 28, 2024, Nextracker filed with the SEC on Form 10-K the Company's financial results for its fiscal year ended March 31, 2024, which was signed by Defendants Shugar, Bennett and Wenger.  The Form 10-K contained the financial information regarding Nextracker's fiscal year 2024 financial results contained in the FY24 Release.

52.    On June 17, 2024, Defendant Boynton spoke about Nextracker at the JPMorgan Energy, Power & Renewables Conference.  As at other investor conferences, the first question after introductions posed to Defendant Boynton regarded potential project delays affecting the solar tracking industry, reflecting the investor concern and interest in this topic.  In response, Defendant Boynton claimed that Nextracker was not suffering from the same ill effects of delay headwinds as its peers because of its purported competitive advantages and the strong demand environment, stating:

Well, I think, first of all, in utility-scale projects, timing is – these are long lead times. These are projects that, in many cases, are planned years and years in advance.  And so things do happen. Projects get pushed out. Projects get pulled in. There can be short-term volatility, which is why we think about our company in terms of annual cycles, less so quarterly.  We really take a long-term view.

In terms of our execution, the culture that Dan and Howard and the team have driven is being maniacally customer-focused and maniacally engineering-focused. It's really been so apparent to me these last first two weeks just how amazing the engineering talent is. It's just world-class engineering, but also just totally customer-focused.

And with this business we've scaled, we've done business in 40 countries. If you think about that 40 countries, US is still the lion's share of it where things are further ahead. But we've got a large pool of existing projects underway, and the demand is strong. And so I think to the extent that there are movements, if a customer wants to delay, we will work with that customer to delay. If a customer wants to pull it in, we'll try to pull it in.

And I think with that, we probably have been a little more resilient because of the size and scale and able to meet our customers' demands and really focus on on-time delivery. And so I think that's been helpful to us. And so there will be times, I'm sure, in the future where things push out or pull in. But I think with the tailwinds that we've seen, we've been able to see, really good year-over- year growth the last sort of five quarters-ish.

53.    Then on June 26, 2024, the Company filed its 2024 Proxy Statement on Schedule 14A with the SEC. The 2024 Proxy Statement solicited shareholder approval in favor of, *inter alia*, the appointment of Defendants Blunden, Mandel, and Shih, as well as approval of executive compensation.

54.    In the 2024 Proxy Statement, shareholders were informed that:

**Role of the Board in Risk Oversight**

An important function of the Board is oversight of risk management at Nextracker. Risk is inherent in business, and the Board's oversight, assessment and decisions regarding risks occur in the context of and in conjunction with the other activities of the Board and its committees. The Board believes that its current governance structure facilitates its risk oversight responsibilities.

The Audit Committee manages risk by overseeing the integrity of the Company's financial statements and internal controls; the qualifications, independence and performance of the Company's independent registered public accounting firm; the performance of the Company's internal audit function; risk assessments from management with respect to cybersecurity; and the Company's compliance with legal and regulatory requirements.

The Nom Gov Committee manages risk by reviewing and evaluating the size, composition, function and duties of the Board consistent with its needs; making recommendations to the Board as to determinations of director independence; reviewing and reassessing the Company's Corporate Governance Guidelines and the Code of Business Conduct and Ethics for the Company and overseeing compliance with such Code.

The C&P Committee manages risk by reviewing and assessing risks arising from the Company's employee compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on the company; working with the Chief Executive Officer to plan for the succession of the Chief Executive Officer and other senior executive officers, including developing plans for interim or emergency succession; and overseeing the Company's human capital management strategy.

It is the responsibility of the committee chairs to report findings regarding material risk exposures to the Board as quickly as possible. Our Chief Executive Officer, Chief Financial Officer and General Counsel, Chief Ethics and Compliance Officer & Secretary coordinate between the Board and management with regard to the determination and implementation of responses to any problematic risk management issues.

55. The 2024 Proxy Statement was false and misleading as it failed to disclose that: (i) that the impact of project delays on Nextracker's business, financial results, and prospects was far more severe than represented to investors; (ii) that permitting and interconnection delays had materially impaired Nextracker's ability to convert backlog into revenue at historical conversion rates; (iii) that Nextracker had been unable to offset the negative impact from project delays through increased client demand and the purported ability to pull forward its other projects in the manner represented by the Individual Defendants; (iv) that Nextracker did not possess the competitive advantages which purportedly shielded it from industry-wide headwinds or the ability to effectively offset the adverse effects of project delays as claimed by defendants; and (v) that, as a result of (i)-(iv) above, the Individual Defendants lacked a reasonable basis for their positive statements about Nextracker's business, financial results, and prospects.

56. The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not being complied with, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct.  Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.  As the Director Defendants knew, or should have known in the

exercise of prudent business judgment, the foregoing, these statements are half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

57.    As a result of the Director Defendants' causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, among other things, to appoint Defendants Blunden, Mandel, and Shih to the Board, as well as to approve executive compensation.

58.    The above-referenced statements were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Nextracker's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them, as follows: (i) that the impact of project delays on Nextracker's business, financial results, and prospects was far more severe than represented to investors; (ii) that permitting and interconnection delays had materially impaired Nextracker's ability to convert backlog into revenue at historical conversion rates; (iii) that Nextracker had been unable to offset the negative impact from project delays through increased client demand and the purported ability to pull forward its other projects in the manner represented by the Individual Defendants; (iv) that Nextracker did not possess the competitive advantages which purportedly shielded it from industry-wide headwinds or the ability to effectively offset the adverse effects of project delays as claimed by the Individual Defendants; and (v) that, as a result of (i)-(iv) above, the Individual Defendants lacked a reasonable basis for their positive statements about Nextracker's business, financial results, and prospects.

## THE TRUTH EMERGES

59.    Then, on August 1, 2024, Nextracker issued a release which announced results for its first fiscal quarter ended June 30, 2024 (the "1Q25 Release").  The release revealed that Nextracker's revenue had declined sequentially, from $737 million in the fourth fiscal quarter of 2024 to $720 million during the first fiscal quarter of 2025.  Similarly, Nextracker's GAAP gross profit had declined sequentially from $340 million in the fourth fiscal quarter of 2024 to $237 million during the first fiscal quarter of 2025.  Notably, the Company did not raise guidance for

the first time since it became a public company, implying a slowdown in growth for the remainder of the year.

60.    In a related earnings call, the Individual Defendants belatedly admitted that Nextracker was not in fact effectively offsetting the timing headwinds impacting the overall industry as previously represented.  Defendant Shugar conceded that "it is taking longer for projects to be fulfilled in real life due to" "construction permits or interconnection delays." Defendant Wenger further admitted that only "80% of that backlog is expected to be realized over the next eight quarters."  When asked by an analyst if this was a shift from prior commentary on Nextracker's backlog conversion rate, Defendant Wenger acknowledged that yes, "[i]t is a bit of a shift, honestly."  He continued:

> The project life cycles are getting a little bit longer[.] Dan mentioned that permitting and interconnection are now the drivers for the long pole in the tent or getting projects perfected. That has – is taking more time than it did two years ago, three years ago. And so in addition to things like module availability, which is a secondary or maybe even a tertiary issue, project cycles are moving somewhat to the right.

61.    As a result of this news, the price of Nextracker common stock dropped from $46.83 per share when the market closed on August 1, 2024 to $39.81 per share when the market closed on August 5, 2024, a 15% decline on abnormally high volume over two trading days.

62.    On October 30, 2024, in connection with reporting its second fiscal quarter of 2025 results, Nextracker revealed that its quarterly revenue and profit continued to decline sequentially, to $636 million and $225 million, respectively.  Nextracker stock has continued its downward trajectory and fell to lows of less than $34 per share by the end of calendar 2024.

## DAMAGE TO THE COMPANY

### Securities Class Action

63.    On December 27, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and the Officer Defendants.  The complaint alleges violations of Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 and SEC Rule 10b-5, in the case captioned: *Weber v. Nextracker, Inc., et al.*, Case No. 5:24-cv-09467 (N.D. Cal.) ("Securities Class Action").

64. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers. The Company will continue to incur significant sums in relation to the above Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

65. At all relevant times, the Company paid lucrative compensation to the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

66. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

67. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damages to the Company**

68. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

69.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

70.     As a direct and proximate result of the Individual Defendants' conduct, Nextracker has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## CORPORATE GOVERNANCE

71.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.  Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

72.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

73.     At all relevant times hereto, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which applies to all "employees, officers and directors of Nextracker Inc."

74.     The Code of Conduct states the following with respect to "Chief Compliance & Ethics Officer":

> Nextracker's Chief Compliance & Ethics Officer is responsible for overseeing our Ethics & Compliance Program and ensuring that Nextracker follows all applicable laws and regulations as well as our own policies and procedures. The Chief Compliance & Ethics Officer is also responsible for partnering with stakeholders

and reports quarterly to the Audit Committee on the compliance program and significant matters.

75.    In a section entitled "Integrity in the Workplace," the Code of Conduct states:

At Nextracker, we appreciate the diverse ideas and experiences of our employees, and value the creativity and innovation that comes from them.

We are committed to treating one another with respect and providing a safe, healthy, sustainable and responsible workplace.

**1. Doing the Right Thing**

We make ethical decisions.

We follow our Code, Nextracker policies and the law.

We proactively ask questions about Nextracker policies or procedures whenever we are unclear about them.

We report any violations of this Code, the law or applicable regulations. See Ethics Hotline.

We cooperate fully and honestly with any internal audit or investigation.

We each foster an environment where others feel comfortable asking questions, raising concerns and reporting matters without fear of retaliation.

76.    In a section entitled "Communications Outside the Company," the Code of Conduct states:

We communicate clear, accurate, up-to-date and appropriate information about our businesses, but only the Chief Executive Officer, the Presidents, the Chief Financial Officer, the General Counsel, and the Director of Investor Relations, or another member of senior management approved by one of the foregoing persons, are authorized to communicate with the public on behalf of our Company. Requests for financial or other information about the Company from the media, the financial community, stockholders or the public should be referred to one or more of these authorized spokespersons or the General Counsel, as appropriate. Except as set forth in Section II(5) above, all other employees are prohibited from responding to any request for information about Nextracker from the media, securities analysts, current or prospective investors or other third parties without prior approval.

This means that if approached by a reporter, analyst or stockholder, or when using social media, including any blogs, social networking site, photo/video sharing and chat rooms, we should:

Protect our Company's confidential information;

Obtain prior approval from the Marketing team before posting any information about our Company or customers in a public place;

Obtain prior approval from the Chief Financial Officer or General Counsel before allowing reporters or financial analysts to visit a facility;

Direct any inquiries from the media, the financial community, stockholders or the public to the Chief Financial Officer or General Counsel; and

Except as set forth in Section II(5) above, direct any inquiries from regulators or the government to Nextracker's General Counsel.

77.     In a section entitled "Books and Records," the Code of Conduct states:

We seek to create value by achieving superior financial results. We must always produce honest, accurate and complete financial information, strictly follow generally accepted accounting principles ("GAAP") and have appropriate internal controls and processes to ensure that all accounting and financial reports comply with applicable rules and are properly documented.

We are responsible for ensuring that our books and records are free from false or misleading entries, engaging independent auditors, and ensuring that our books and records are kept according to legal requirements and applicable accounting standards.

We do not keep undisclosed or unrecorded corporate funds for any purpose.

We issue payment only where there is appropriate, complete and accurate supporting records and approval.

If you believe that any Nextracker business records or accounts have been falsified, improperly changed or destroyed, immediately contact the Legal Department or use another one of our reporting resources. This kind of activity will not be tolerated.

78.     With respect to "Compliance with Securities Laws," the Code of Conduct states:

As determined by management, we provide timely, full, fair, accurate and understandable information to the investing public in keeping with securities laws.

We follow Regulation FD, which prohibits the selective disclosure of material, nonpublic information (e.g., to security holders or members of the financial analyst community).

We act with integrity when it comes to the securities markets, and have implemented an insider trading policy that includes the following prohibitions: You may not trade in Nextracker securities while you are aware of material nonpublic information about Nextracker. This prohibition also applies to transactions in the securities of other publicly-traded companies, including Nextracker's customers, suppliers and other business partners, about which you may learn material, nonpublic information while working for Nextracker. "Material nonpublic information" is defined broadly and includes any information that has not been made available to the public and that a reasonable investor would consider important in making an investment decision regarding Nextracker's securities, or information likely to have an impact on the price of Nextracker securities. Material nonpublic information can be positive or negative, historical or forward-looking, and quantitative or qualitative. It is not possible to define all categories of material nonpublic information and when in doubt, you should treat nonpublic or confidential information as material and consult with the Legal Department prior to engaging in a securities transaction.

You may not communicate or "tip" material, nonpublic information to others who may trade in Nextracker securities (or any other publicly-traded securities) based on that information. You may not have another person trade in Nextracker securities (or any other publicly-traded securities) for you based on that information.

You must not engage in (i) derivative transactions such as trading in any interest or position relating to the future price of Nextracker's securities, such as a "put", "call" or "short sale", (ii) hedging transactions with Nextracker's securities or use such securities as collateral for margin accounts or (iii) pledging transactions with Nextracker's securities or use such securities as collateral for loans.

**Audit Committee Charter**

79.    At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee members.  The Audit Committee Charter states that its purpose is to "assist the Board in fulfilling its responsibilities with respect to:

• the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

• the Company's compliance with legal and regulatory requirements;

• the qualifications and independence of the Company's external auditor (the "Independent Auditor");

• the performance of the Company's internal auditing function ("Internal Audit") and the Independent Auditor; and

• the administration of the Company's Related Party Transaction Policy."

80.    In a section entitled "Responsibilities and Duties," the Audit Committee Charter states, in relevant part:

> •       Meet to review and discuss the annual audited financial statements and quarterly financial statements with management and the Independent Auditor, including the annual and quarterly report disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall make a recommendation to the Board as to whether the annual audited financial statements should be included in the Company's Annual Report on Form 10-K.
>
> •       Review and discuss earnings press releases as well as financial information and earnings guidance provided to analysts and ratings agencies.
>
> •       Review the Company's financial reporting processes, disclosure controls and procedures and internal controls in consultation with management, the Independent Auditor and Internal Audit. Such review shall include a consideration of major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of identified deficiencies. Review any analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.
>
> •       Discuss policies with respect to risk assessment and risk management, the Company's major fraud, litigation and financial risk exposures and the steps management has taken to monitor and control such exposures
>
> •       Prepare the report of the Committee required to be included in the Company's Annual Report on Form 10-K and proxy statement.
>
> •       Perform any other activities required by the federal securities laws, the rules and regulations of the Nasdaq Stock Market, and any other applicable law, rules or

24
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regulations and perform other activities that are consistent with this charter, the Company's certificate of incorporation, bylaws and governing laws as the Committee or the Board deems necessary or appropriate.

## DUTIES OF THE DIRECTOR DEFENDANTS

81.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

82.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

83.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

84.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

85.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the

Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

86.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

87.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

88.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and other unlawful conduct by the Individual Defendants.

89.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

90.    Plaintiff is a current owner of the Company's stock and has continuously been an owner of the Company's stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

91.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

92.    The Company Board is currently comprised of nine (9) members – the Director Defendants, as defined *supra*.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

93.    Each of the Director Defendants face a likelihood of liability in this action because

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

94.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

95.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

96.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

97.    As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme and consciously disregarded their duties to protect corporate assets.

98.    Each of the Director Defendants oversaw, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs

from the Company's stockholders or recklessly and/or with gross negligence disregarded or failed to oversee the wrongs complained of herein and are therefore not disinterested parties.

99.     Each of the Director Defendants reviewed, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

100.    The Director Defendants each solicited the 2024 Proxy Statement which, under their watch and direction, contained false and misleading statements, as discussed, *supra*.  As such, the Director Defendants each face a substantial likelihood of liability for their violations of Section 14(a) of the Exchange Act and cannot consider a demand to sue as a result.

101.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS ARE<br>NOT INDEPENDENT OR DISINTERESTED**

**<u>Defendant Shugar</u>**

102.    Defendant Shugar is not disinterested or independent, and therefore, is incapable of considering demand because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with Nextracker, making him not independent, as admitted by the Company.  As such, Defendant Shugar cannot independently consider any demand to sue himself for breaching his fiduciary duties to Nextracker, because that would expose him to liability and threaten his livelihood.

103.    As CEO, Defendant Shugar also fails the NASDAQ's bright-line independence test and cannot, therefore, be considered independent, as the Company admits in its 2024 Proxy Statement.  As such, Defendant Shugar could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Shugar is therefore

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  futile.

2  104.    Because of Defendant Shugar's participation in the gross dereliction of fiduciary

3  duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Shugar is unable

4  to comply with his fiduciary duties and prosecute this action.  Defendant Shugar is in a position of

5  irreconcilable conflict of interest in terms of the prosecution of this action and defending himself

6  in the Securities Class Action, brought under the Securities Exchange Act of 1934.

7  105.    Defendant Shugar is neither independent nor disinterested.  Any demand upon

8  Defendant Shugar is futile and, thus, excused.

9  **Defendant Wenger**

10  106.    Defendant Wenger is not disinterested or independent, and therefore, is incapable

11  of considering demand because he (as its president) is an employee of the Company who derives

12  substantially all of his income from his employment with Nextracker, making him not independent,

13  as admitted by the Company.  As such, Defendant Wenger cannot independently consider any

14  demand to sue himself for breaching his fiduciary duties to Nextracker, because that would expose

15  him to liability and threaten his livelihood.

16  107.    As President, Defendant Wenger also fails the NASDAQ's bright-line

17  independence test and cannot, therefore, be considered independent, as the Company admits in its

18  2024 Proxy Statement.  As such, Defendant Wenger could not objectively and disinterestedly

19  consider a demand to sue the Individual Defendants and any demand upon Defendant Shugar is

20  therefore futile.

21  108.    Because of Defendant Wenger's participation in the gross dereliction of fiduciary

22  duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Wenger is unable

23  to comply with his fiduciary duties and prosecute this action.  Defendant Wenger is in a position

24  of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself

25  in the Securities Class Action, brought under the Securities Exchange Act of 1934.

26  109.    Defendant Wenger is neither independent nor disinterested.  Any demand upon

27  Defendant Wenger is futile and, thus, excused.

28

**Defendants Coslet and Mandel**

110.    Defendant Coslet currently serves as Vice Chairman of TPG Global LLC, a global alternative asset firm, and has been with TPG since 1993. Likewise, Defendant Mandel is a Partner with TPG Rise Climate, the dedicated climate investing strategy of TPG, having worked for TPG since 2019. As such, Defendants Coslet and Mandel could not reasonably consider a demand to sue one another as they (i) have a longstanding business relationship with one another through their work at TPG; and/or (ii) could not make a decision which could have an adverse impact on their work (*i.e.*, as a result of suing a coworker) and livelihood outside of Nextracker.

111.    Furthermore, as noted in the Company's 2024 Proxy Statement, the Company has various agreements with TPG. As such, Defendants Coslet and Mandel could not consider a demand to sue the Individual Defendants which could lead to an adverse impact on TPG and the agreements between the Company and TPG moving forward.

**Defendants Blunden, Mandel and Shih**

112.    Defendants Blunden, Mandel and Shih each personally benefitted from the wrongdoing alleged herein. Specifically, Defendants Blunden, Mandel, and Shih, among others, caused the 2024 Proxy Statement to contain false and misleading statements. Upon those false and misleading statements, Defendants Blunden, Mandel, and Shih were each re-elected to the Board, thus enabling them to continue breaching their fiduciary duties.

**Defendants Blunden, Mandel and Thomas**

113.    Defendants Blunden, Mandel and Thomas are also all members of the Audit Committee and had certain additional duties by virtue thereof, as described *supra*. Among the responsibilities, Defendants Blunden, Mandel and Thomas were required to oversee the Company's compliance with all laws and regulations. However, Defendants Blunden, Mandel and Thomas failed to fulfil these duties and permitted and/or caused the Company to issue false and/or misleading statements. Defendants Blunden, Mandel and Thomas further breached their fiduciary duties by failing to ensure that adequate internal controls were in place regarding the serious issues and deficiencies described above.

**Additional Reasons Demand is Futile**

114.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.  In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.  Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

115.     Nextracker has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Nextracker any part of the damages Nextracker suffered and will continue to suffer thereby.  Thus, any demand upon the Director Defendants would be futile.

116.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

117.     The acts complained of herein constitute violations of fiduciary duties owed by Nextracker's officers and directors, and these acts are incapable of ratification.

118.     The Director Defendants may also be protected against personal liability for their

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Nextracker.  If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of Nextracker, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile and, therefore, excused.

119.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Nextracker to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

120.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least a majority of the Director Defendants, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Against the Individual Defendants for Breach of Fiduciary Duties)**

121.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

122.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

123.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

124.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125.    As a direct and proximate result of the Individual Defendants' failure to fulfil their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

**(Against the Individual Defendants for Waste of Corporate Assets)**

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

129.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

130.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

133.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

134.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Aiding and Abetting)**

135.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants.  Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

137.    Specifically, the Director Defendants, in violation of the Company's corporate governance and state law, engaged in and/or permitted the Company to engage in the Mismanagement Misconduct, Related Party Misconduct, Promotional Misconduct, and the

scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

138.     The Officer Defendants, in violation of the Company's corporate governance and state law, engaged in and/or permitted the Officer Defendants' lack of oversight and the scheme to issue materially false and misleading statements to the Company's shareholders in investing public for their own benefit, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

139.     As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

140.     As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

141.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**FIFTH CAUSE OF ACTION**

**(Against the Director Defendants for Violations
of Section 14(a) of the Exchange Act)**

142.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

144.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

145.    Under the direction and watch of the Director Defendants, the 2024 Proxy Statement failed to disclose that: (1) though the Company touted its Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

146.    The 2024 Proxy Statement also failed to disclose that: (i) that the impact of project delays on Nextracker's business, financial results, and prospects was far more severe than represented to investors; (ii) that permitting and interconnection delays had materially impaired Nextracker's ability to convert backlog into revenue at historical conversion rates; (iii) that Nextracker had been unable to offset the negative impact from project delays through increased client demand and the purported ability to pull forward its other projects in the manner represented by the Individual Defendants; (iv) that Nextracker did not possess the competitive advantages which purportedly shielded it from industry-wide headwinds or the ability to effectively offset the adverse effects of project delays as claimed by defendants; and (v) that, as a result of (i)-(iv) above, the Individual Defendants lacked a reasonable basis for their positive statements about Nextracker's business, financial results, and prospects.

147.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading.    The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in

the 2024 Proxy Statement, including but not limited to the re-election of certain Director Defendants.

148.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of certain Individual Defendants to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

149.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, unjust enrichment, and aiding and abetting;

C.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

1

## JURY DEMAND

2

Plaintiff demands a trial by jury on all issues so triable.

3

Dated: January 23, 2025

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:    */s/ Alex J. Tramontano*
       ALEX J. TRAMONTANO

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
saviles@whafh.com

THOMAS J. McKENNA, Esq.
GREGORY M. EGLESTON, Esq.
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff Clifton Murie*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## **<u>VERIFICATION</u>**

2      I, CLIFTON MURIE, declare that I have reviewed the Verified Shareholder

3   Derivative Complaint ("Complaint") prepared on behalf of Nextracker, Inc. and

4   authorize its filing. I have reviewed the allegations made in the Complaint, and to those

5   allegations of which I have personal knowledge, I believe those allegations to be true.

6   As to those allegations of which I do not have personal knowledge, I rely on my counsel

7   and their investigation and for that reason believe them to be true.  I further declare that

8   I am a current holder, and have been a holder, of Nextracker, Inc. common stock at all

9   relevant times.

10

11

12      _Clifton Murie_

13   CLIFTON MURIE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28